ETAN NEWMAN, ESQ. (CA SBN 308728)
PANGEA LEGAL SERVICES
391 SUTTER ST., SUITE 500
SAN FRANCISCO, CA 94108
TEL.  (415) 652-0907
FAX. (415) 593-5335
etan@pangealegal.org

*Pro Bono Attorney for Petitioner*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

█████████████████████████
a.k.a. █████████████████████

                              *Petitioner,*

            v.

SERGIO ALBARRAN, Field Office Director of
the San Francisco Field Office of U.S.
Immigration and Customs Enforcement;
TODD M. LYONS, Acting Director of
U.S. Immigration and Customs Enforcement;
KRISTI NOEM, Secretary of the U.S.
Department of Homeland Security; and
PAMELA BONDI, Attorney General of the
United States,

                              *Respondents.*

Case No.  5:25-cv-8774-VC

**MOTION FOR TEMPORARY
RESTRAINING ORDER**

**POINTS AND AUTHORITIES
IN SUPPORT OF MOTION
FOR TEMPORARY
RESTRAINING ORDER AND
MOTION FOR PRELIMINARY
INJUNCTION**

IMMIGRATION HABEAS CASE

## NOTICE OF MOTION

Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure and Rule 65-1 of the Local rules of this Court, Petitioner, Mr. ████ ████ ████ ███ ("Mr. ████ hereby moves this Court to order Respondents to immediately release Mr. ████ and enjoin Respondents from re-arresting Mr. ████ unless and until he is afforded notice and a hearing before a neutral decisionmaker, as required by the Due Process clause of the Fifth Amendment, to determine whether clear and convincing evidence demonstrates that he currently poses a flight risk or danger to the community such that his re-incarceration would be justified.

The reasons in support of this Motion are set forth in the accompanying Memorandum of Points and Authorities. This Motion is based on the Petition for Writ of Habeas Corpus, filed at Dkt. 1, accompanying exhibits, Dkt. 2, and the attached Authenticating Declaration of Etan Newman and Exhibits in Support of TRO. Notice of the filing of this Motion has been provided to Respondents' counsel. *See* Newman Decl., Exh. A (TRO Notice Decl.).

Mr. ████ warrants a temporary restraining order due to his weighty liberty interest under the Due Process Clause of the Fifth Amendment in ending his unconstitutional detention and preventing his re-detention absent a constitutionally-compliant pre-deprivation hearing before a neutral adjudicator.

Respondents re-detained Mr. ████ on Tuesday, October 14, 2025 at approximately 11:25AM and he remains detained at the time of filing the instant motion. Mr. ████ continued re-incarceration will result in immediate, irreparable injury, not only to Mr. ████ whose mental and physical health will deteriorate significantly in detention, but also to his disabled wife and their two children, ages 16 and 10, for whom Mr. ████ is the primary breadwinner.

Absent immediate relief from this Court, Mr. ████ continued re-detention without notice and a hearing on whether such re-detention is justified is violating and will continue to violate Mr. ████ constitutional rights.

i

1    WHEREFORE, Mr. ▮▮▮ prays that this Court grant his request for a temporary

2  restraining order and a preliminary injunction ordering Respondents to immediately release him

3  and enjoining them from re-detaining him unless and until he is afforded a constitutionally-

4  compliant hearing before a neutral adjudicator on the question of whether his re-detention is

5  justified.

6      Dated: October 15, 2025                    Respectfully Submitted

7

8                                                /s/Etan Newman
                                                 Etan Newman
9                                                Attorney for the Petitioner

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **Table of Contents**

**NOTICE OF MOTION** ...................................................................................................i

**I.    INTRODUCTION** .................................................................................................1

**II.   FACTUAL BACKGROUND** .................................................................................2

**III.  LEGAL STANDARD** ............................................................................................8

**IV.  ARGUMENT** .........................................................................................................8

    **A.    Mr. ▮▮▮▮ is Likely to Succeed on the Merits of His Claim That In This Case The Constitution Required a Hearing Before a Neutral Adjudicator Prior to Any Re-Incarceration by ICE** ...........................................................8

    **B.    Mr. ▮▮▮▮ will Suffer Irreparable Harm Absent Injunctive Relief** ...........18

    **C.    The Balance of Equities and the Public Interest Favor Granting the Temporary Restraining Order** .........................................................................19

**V.    CONCLUSION** .....................................................................................................20

I

## I. __INTRODUCTION__

Petitioner, ███████ ███████ ███ ███ ("Mr. ███████ by and through undersigned counsel, hereby files this motion for temporary restraining order and preliminary injunction to order Respondents to immediately release Mr. ███ and enjoin the U.S. Department of Homeland Security ("DHS") and U.S. Immigration and Customs Enforcement ("ICE") from re-arresting Mr. ███ unless and until he is afforded notice and a hearing before a neutral decisionmaker at which the government is required to establish he is a danger or flight risk, as required by the Due Process clause of the Fifth Amendment. *See, e.g.*, *Barrenechea v. Albarran*, No. 25-cv-07883-VC, 2025 U.S. Dist. LEXIS 189726 (N.D. Cal. Sept. 22, 2025); *Duong v. Kaiser*, No. 25-cv-07598-JST, 2025 U.S. Dist. LEXIS 185024 (N.D. Cal. Sept. 19, 2025); *Diaz v. Kaiser*, No. 25-cv-05071, 2025 U.S. Dist. LEXIS 113566 (N.D. Cal. June 14, 2025); *Pinchi v. Noem*, No. 5:25-cv-05632-PCP, 2025 U.S. Dist. LEXIS 142213 (N.D. Cal. July 4, 2025); *Ortega v. Bonnar*, 415 F. Supp. 3d 963 (N.D. Cal. 2019).

The DHS previously incarcerated Mr. ███████ an asylum seeker who has never been arrested or convicted of a crime in the United States—for over two years, during which time his physical and mental health suffered acutely. In May 2020, this Court ordered Mr. ███ released pursuant to a bail application process that took care to consider flight risk and danger to the community. While at liberty for more than five years since then, Mr. ███ has fully complied with this Court's bail order and his ICE supervision conditions, including wearing a GPS ankle monitor and participating in the Intensive Supervision Appearance Program ("ISAP"). Based on Mr. ███ diligent compliance, ICE removed his GPS ankle monitor around 2022. Mr. ███ continued to participate in ISAP, appear at virtual check-ins, and comply with all required conditions through the BI SmartLINK application on his phone. Mr. ███ has never been arrested or convicted of a crime in the United States, and has continued to remain law-abiding since his release in 2020. Nevertheless, on Tuesday, October 14, 2025, ICE re-detained Mr. ███ without notice when Mr. ███ appeared as requested at an in-person

ISAP check-in.

Mr. ████ has a strong interest in his liberty and is likely to succeed in establishing that ICE's action in re-detaining him before providing notice or hearing before a neutral adjudicator violates the Due Process Clause. Further, Mr. ████ and his family will suffer immediate and irreparable harm from his detention. Mr. ████ wife has disabilities that limit her ability to work and care for their children, leaving Mr. ████ as the primary family breadwinner and caretaker, and his detention has an immediate harmful effect on his minor children. Further, the balance of equities and the public interest favor Mr. ████ An Immigration Judge ("IJ") has granted him relief from deportation *three times*, but each time DHS has appealed, prolonging Mr. ████ removal proceedings. Since his release from custody in 2020, the government granted Mr. ████ work authorization. He works for a construction company, attends church, cares for his children, and contributes to the community. The Court should order his immediate release and enjoin his re-detention absent a hearing at which the government must show by clear and convincing evidence that he is a current flight risk or danger to the community to justify further detention.

## II.   **FACTUAL BACKGROUND**

### A.  **Flight from Persecution and Initial Removal Proceedings**

Mr. ████ is a 42-year-old man from El Salvador. *See* Dkt. 2-1, Exh. A (Weiss Decl.) ¶ 3. In El Salvador, Mr. ████ was repeatedly harassed, falsely arrested, and tortured by Salvadoran officials because of his political activity on behalf of the ARENA party. *Id.*, ¶ 8.

After the opposing FMLN party won local elections, police officers engaged in retribution against those who had supported ARENA, including Mr. ████ *Id.* On one occasion, police handcuffed Mr. ████ to a tree, put a bag over his face, and beat him with a stick on his stomach and legs to coerce a confession to a crime he did not commit. *Id.* On another occasion, officers slammed his forehead into jail cell bars. *Id.* The repression escalated and on one occasion officers even falsely charged Mr. ████ with murder. *Id.* Mr. ████ was released after a criminal court judge found him innocent and dismissed the charges. *Id.* Police

subsequently arrested Mr. ███ at least four more times on trumped-up charges, but each time authorities failed to present any evidence of his involvement in any crime, and charges were either never filed or dismissed. *Id.*

Around 2015, Mr. ███ fled El Salvador after gang members associated with the FMLN demanded that he spread propaganda on behalf of FMLN. *Id.*, ¶ 9. When Mr. ███ refused, the gang members viciously attacked him, sending him to the hospital with a broken collarbone. *Id.* After Mr. ███ wife reported the assault, gang members appeared outside Mr. ███ home and began shooting at the home, injuring Mr. ███ brother. *Id.*

Mr. ███ fled to the United States, and was detained by the Department of Homeland Security ("DHS") near the border. *Id.*, ¶ 10-11. He was placed into removal proceedings and applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). *Id.* DHS initially detained Mr. ███ under its authority in 8 U.S.C. § 1226. *Id.*, ¶ 12; Newman Decl., Exh. H (Form I-286). However, an Immigration Judge ("IJ") determined Mr. ███ was not a flight risk or danger to the community and ordered him released on a $2500 bond. *Id.*, ¶ 13. Mr. ███ was released and moved to San Jose, California. *Id.* He complied with all bond conditions.

**B. Re-Detention and Repeated Grants of Relief by the Immigration Judge**

An IJ has granted Mr. ███ protection from removal *three times*, but each time the DHS has appealed, leading to further proceedings. *Id.*, ¶ 17-21. Mr. ███ removal proceedings currently remain pending at the Board of Immigration Appeals ("BIA").

In early 2018, while his asylum application was pending, Mr. ███ received a notice to present himself at ICE offices in San Francisco, California. *Id.*, ¶ 15. On February 5, 2018, Mr. ███ appeared as requested, and was arrested by DHS at the appointment. *Id.* DHS stated they had received information that Mr. ███ was subject to an outstanding warrant and Interpol Red Notice in El Salvador. *Id.* The warrant and Red Notice, issued more than two years after Mr. ███ left El Salvador, alleged that Mr. ███ had been involved in gang-related activities and

"aggravated theft," without any specific date, location, or other details. *Id.* Mr. ███ denied ever having been involved in a theft or gang activity. *Id.*

On July 5, 2018, an immigration judge ("IJ") held a hearing on Mr. ███ applications for asylum, withholding of removal, and CAT protection at which Mr. ███ testified. *Id.,* ¶ 16. On August 16, 2018, the IJ issued a decision granting Mr. ███ asylum. *Id.,* ¶ 17; *see also* Newman Decl., Exh. G (IJ Dec., dated 08/16/18). The IJ found Mr. ███ credible, and found that there was insufficient evidence to believe that Mr. ███ had committed any crime in El Salvador that would make him ineligible for asylum. *See id.*; 8 U.S.C. § 1158(b)(2)(iii) (making ineligible for asylum any person for whom there are "serious reasons to believe" they have committed a "serious non-political crime"). However, DHS appealed the IJ's decision granting asylum, and the BIA subsequently remanded the case to the IJ to further evaluate the Red Notice. Dkt. 2-1, Exh. A (Weiss Decl.), ¶ 18.

On March 25, 2019, the IJ issued second decision granting Mr. ███ asylum. *Id.,* ¶ 19; *see also* Newman Decl., Exh. F (IJ Dec., dated 03/25/19). The IJ found that there were significant deficiencies in the arrest warrant and Red Notice. *Id.* Examining the evidence of corruption in El Salvador and Mr. ███ own testimony, the IJ found that the allegations were likely politically motivated, and there was no "fair probability" that Mr. ███ engaged in criminal activity in El Salvador. *Id.* However, DHS again appealed the IJ's decision granting asylum, and the BIA issued a decision reversing the asylum grant. *Id.* The BIA stated that DHS need only provide evidence that the serious non-political crime bar "may apply" and then the burden shifts to Mr. ███ to prove conclusively that the bar does not apply. *Id.* Under that burden-shifting, the BIA found that Mr. ███ had not met his high burden. *Id.* The BIA remanded for the IJ to consider Mr. ███ CAT claim. *Id.*

On November 5, 2019, the IJ issued a third decision, this time granting Mr. ███ CAT protection. *Id.*, ¶ 21; *see also* Newman Decl., Exh. E (IJ Dec., dated 11/05/2019). The IJ found that, given past torture and the government's continued interest in him, Mr. ███ is likely to be

tortured in El Salvador. *Id.* DHS filed a third appeal to the BIA shortly thereafter, on November 15, 2019. Mr. ████ case has been pending at the BIA since then, with no decision. Dkt. 2-1 (Weiss Decl.), ¶ 22. No immigration judge has ever ordered Mr. ████ removed from the United States, and his removal case remains pending.

### C. Release and Participation in the Community Over the Past 5 Years

On May 25, 2020, after Mr. ████ had been in custody for more than two years and the IJ had thrice granted him relief, this Court granted his individualized bail application. *See* Dkt. 2-1, Exh. B (Bail Order); see *Zepeda Rivas v. Jennings*, 445 F. Supp. 3d 36 (N.D. Cal. 2020), *aff'd in part and ref'd to mediation*, 845 Fed. Appx. 530 (9th Cir. 2021) (granting TRO and providing district court bail application process for individuals detained in certain ICE facilities). The *Zepeda Rivas* bail process took care "both to avoid releasing detainees who are a danger to the community and to minimize the possibility that detainees will fail to appear." *Id.* After reviewing Mr. ████ bail application, this Court ordered Mr. ████ released on bail. Dkt. 2-1, Exh. B; Exh. A (Weiss Decl.), ¶ 31.

The next day, May 26, 2020, ICE released Mr. ████ on an order of supervision. *See* Dkt. 2-1, Exh. A (Weiss Decl.), ¶ 32. ICE placed Mr. ████ on a monitoring program through the Intensive Supervision Appearance Program ("ISAP"). *Id.* At first, Mr. ████ was outfitted with a mandatory ankle monitor with a GPS tracking device. *Id.*, ¶ 20. However, around 2022, in recognition of Mr. ████ compliance with his order of supervision, ISAP de-escalated Mr. ████ case and removed the GPS ankle monitor. *Id.* Mr. ████ continued to communicate with ISAP, appear at virtual check-ins, and comply with all required conditions through the BI SmartLINK application on his phone. *Id.* He has repeatedly attended his virtual check-ins through the BI SmartLINK application. *Id.* He has not been arrested for or convicted of any crime. *Id.*

Since his release, Mr. ████ has lived with and cared for his wife and minor children, ages 10 and 16, in San Jose, California. *Id.*, ¶ 6. In 2021, U.S. Citizenship and Immigration

Services ("USCIS") granted Mr. ███ work authorization. *Id.*, ¶ 35. He works at a construction company and is the primary breadwinner for his family. *Id.*, ¶ 6. Mr. ███ wife ███ is limited in her ability to work and attend to the children. Newman Decl., Exh. B (███ Decl.), ¶ 3. She suffers from chronic pain, preventing her from standing for long and making it painful to walk, which in turn limits her ability to work for long periods. *Id.* She also cannot read or write. *Id.*, ¶ 2. She does not drive. *Id.*, ¶ 5. Mr. ███ is the person who manages the household, and takes care of paying rent, bills, buying food, and medicine. *Id.*, ¶ 4. He takes the children to doctors' appointments and other necessary meetings. *Id.*, ¶ 5. Mr. ███ is very attached to his children. *Id.* His older son, J., suffers from a depressed mood, and Mr. ███ is his primary source of emotional support. *Id.*, ¶ 6. In addition to caring for his children, Mr. ███ attends church regularly at ███████████████, in San Jose. *Id.*, ¶ 7.

In addition to work and family life, since his release in 2020 Mr. ███ has continued to actively litigate his immigration case and work to clear his name in El Salvador. In 2022, the BIA set a briefing schedule on the appeal filed by DHS of Mr. ███ CAT grant. Dkt. 2-1, Exh. A, ¶ 23. Mr. ███ timely submitted a brief and an alternative motion to remand based on new country conditions in El Salvador, including the so-called "State of Emergency." *Id.* Subsequently, in August 2022, Mr. ███ submitted a supplemental brief to the BIA after the Ninth Circuit issued *Gonzalez-Castillo v. Garland*, 47 F.4th 971 (9th Cir. 2022). In *Gonzalez-Castillo*, the court considered the case of a Red Notice from El Salvador, and rejected the BIA's burden shifting framework—identical to the one employed in Mr. ███ case—that DHS need only present "some evidence" that the serious nonpolitical crime bar to asylum "might apply" in order to shift the burden to the asylum applicant to disprove it. 47 F.4th at 979. The Ninth Circuit further held that the Red Notice in that case did not meet the probable cause standard. *Id.* at 978-79. Mr. ███ argued to the BIA that *Gonzalez-Castillo* rejected the framework it used to decide his asylum case, and asked the BIA to reassess its asylum decision in light of *Gonzalez-Castillo*. Dkt. 2-1 (Weiss Decl.), ¶ 25.

Further, on April 3, 2023, the Commission for the Control of Interpol's Files ("CCF") deleted the Red Notice related to Mr. ███ finding that the notice "raised questions as to the compliance with applicable rules" of Interpol regarding Red Notices. *Id.*, ¶ 26. Mr. ███ submitted to the BIA the evidence showing deletion of the Red Notice. *Id.*, ¶ 27. DHS did not respond to this filing. *Id.* As of October 14, 2025, Mr. ███ case remains pending at the BIA with no decision on DHS's appeal from the IJ's CAT order or Mr. ███ motions related to his asylum claim. *Id.*

**D. Re-Detention Without Process or Hearing**

On October 9, 2025, Mr. ███ unexpectedly received a call from a person who claimed to be his "new ISAP officer." *Id.*, ¶ 36. The officer told Mr. ███ that his previously-scheduled virtual ISAP check-in on October 16, 2025 was being converted to an in-person check-in at the ISAP office at 393 Blossom Hill Rd., Suite 260, in San Jose, California on October 14, 2025. *Id.*

On October 14, 2025, Mr. ███ appeared as requested at the ISAP office in San Jose, California. *Id.*, ¶ 40. Prior to his appearance, an ISAP officer informed Mr. ███ counsel that there were no plans to detain Mr. ███ and they had simply decided that all individuals on ISAP should not have in-person check-ins. *Id.*, ¶ 39. However, despite these assurances, ICE officers met Mr. ███ at the ISAP office and took him into custody with his wife and child present. *Id.*, ¶ 39. ICE did not provide Mr. ███ any notice, hearing, or process prior to his arrest. *Id.*

After detaining Mr. ███ an ICE officer told Mr. ███ counsel that Mr. ███ had two recent ISAP violations where he failed to upload a photo of himself to the BI Application within the short 2-hour period permitted. *Id.*, ¶ 41. Although the ICE officer acknowledged that Mr. ███ did upload the photo on the same day, he said it was slightly after the 2-hour window. *Id.* ICE did not provide Mr. ███ evidence of deficiencies nor give Mr. ███ an opportunity to provide contrary evidence of compliance before taking him into

MOTION FOR TRO; POINTS AND AUTHORITIES I.S.O. PETITIONER'S MOTION FOR TRO/PI
No. 5:25-cv-8774-VC

custody. *Id.* Mr. ███ contests those assertions and believes he has complied with all ISAP requirements throughout his five years on ISAP. *Id.*, ¶ 42.

Despite five years at liberty during which he has complied with the law, Mr. ███ has now been re-detained without any notice or opportunity to challenge his re-detention. He remains in ICE custody, separated from his family.

## III.   <u>LEGAL STANDARD</u>

Mr. ███ is entitled to a temporary restraining order if he establishes that he is "likely to succeed on the merits, . . . likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [his] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that preliminary injunction and temporary restraining order standards are "substantially identical"). Alternatively, under the Ninth Circuit's sliding scale approach, the Court may grant a temporary restraining order if Mr. ███ raises "serious questions" as to the merits of his claims, the balance of hardships tips "sharply" in his favor, and the remaining equitable factors are satisfied. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011).

## IV.   <u>ARGUMENT</u>

Mr. ███ overwhelmingly satisfies the TRO standard and should be immediately released and remain at liberty until a pre-deprivation hearing is held before a neutral adjudicator at which the government establishes he is a danger to the community or a flight risk. This Court and many others in this district have recently ordered similar relief. *See, e.g., Barrenechea*, 2025 U.S. Dist. LEXIS 189726; *Duong*, 2025 U.S. Dist. LEXIS 185024; *Diaz*, 2025 U.S. Dist. LEXIS 113566; *Pinchi*, 2025 U.S. Dist. LEXIS 142213. The Court should do the same here and grant the TRO.

> **A. Mr. ███ is Likely to Succeed on the Merits of His Claim That In This Case the Constitution Required a Hearing Before a Neutral Adjudicator Prior to Any Re-Incarceration by ICE**

Mr. ███ is likely to succeed on his claim that, in his particular circumstances, Respondents violated his rights under the Due Process Clause by re-detaining him without providing a pre-deprivation hearing before a neutral decision maker to determine whether re-detention is justified by a risk of flight or danger to the community.

Civil immigration detention must be justified by a permissible purpose and reasonably related to that purpose. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The two permissible regulatory goals for immigration detention are "ensuring the appearance of [noncitizens] at future immigration proceedings" and "preventing danger to the community." *Id.* Substantive due process "requires that that…[civil immigration detention] bear some reasonable relation to" one of those two permissible goals. *See Jones v. Blanas*, 393 F.3d 918, 931 (9th Cir. 2004). Where civil detention is not related to a permissible regulatory goal, is "excessive in relation to" its purpose, or is "employed to achieve objectives that could be accomplished" with "alternative and less harsh methods," the detention amounts to punishment in violation of substantive due process. *See id.* at 931-32.

Due process also constrains ICE's power to re-arrest a noncitizen who is at liberty following a release from immigration custody. *See Hernandez v. Sessions*, 872 F.3d 976, 981 (9th Cir. 2017) ("[T]he government's discretion to incarcerate non-citizens is always constrained by the requirements of due process."). "'It is well established that the Fifth Amendment entitles [noncitizens] to due process of law in deportation proceedings.'" *Demore v. Kim*, 528 U.S. 510, 523 (2003) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty" that the Due Process Clause protects. *Zadvydas*, 533 U.S. at 690; *see also id.* at 718 (Kennedy, J., dissenting) ("Liberty under the Due Process Clause includes protection against unlawful or arbitrary personal restraint or detention.").

This Court and others in this district and beyond have recognized that due process requires that a noncitizen like Mr. ███ who was previously found by an adjudicator to be appropriate for release from immigration detention be given a pre-deprivation hearing *before* ICE re-detains him. *See, e.g.*, *Meza v. Bonnar*, No. 18-cv-02708-BLF, 2018 WL 2554572 (N.D.

Cal. June 4, 2018); *Ortega v. Bonnar*, 415 F. Supp. 3d 963 (N.D. Cal. 2019); *Vargas v. Jennings*, No. 20-CV-5785-PJH, 2020 WL 5074312, at *3 (N.D. Cal. Aug. 23, 2020); *Jorge M. F. v. Wilkinson*, 534 F. Supp. 3d 1050 (N.D. Cal. 2021); *Enamorado v. Kaiser*, No. 25-CV-04072-NW, 2025 WL 1382859, at *3 (N.D. Cal. May 12, 2025) (temporary injunction warranted preventing re-arrest where plaintiff had been on bond for more than five years); *Barrenechea*, 2025 U.S. Dist. LEXIS 189726.

Indeed, in similar circumstances to this case, where a noncitizen released in a *Zepeda-Rivas* bail hearing was re-arrested prior to being provided a pre-deprivation hearing, courts have required ICE to immediately release petitioners and ordered that re-detention not occur absent a constitutionally compliant pre-deprivation hearing. *Duong*, 2025 U.S. Dist. LEXIS 185024 (granting PI and finding pre-deprivation hearing required for individual released in *Zepeda-Rivas* bail hearing); *Qazi v. Albarran*, No. 2:25-cv-02791-TLN-SCR, 2025 U.S. Dist. LEXIS 191922 (E.D. Cal., Sept. 29, 2025) (granting TRO); *cf. also Singh v. Andrews*, No. 1:25-cv-00801-KES-SKO (HC), 2025 WL 1918679, at *5, (E.D. Cal. July 11, 2025) (granting preliminary injunction, ordering immediately release from custody, and barring ICE from re-detaining petitioner through pendency of his proceedings without first holding a pre-deprivation hearing); *Arzate v. Andrews*, No. 1:25-cv-00942-KES-SKO (HC), 2025 WL 2230521, at *7 (E.D. Cal. Aug. 4, 2025) (granting temporary restraining order, ordering immediate release from custody, and barring ICE from re-detaining petitioner absent a pre-deprivation hearing), converted to preliminary injunction at Dkt. 15 (Aug. 20, 2025); *Pineda Campos v. Kaiser*, No. 25-cv-06920 (EKL), Dkt. 4 (N.D. Cal. Aug. 16, 2025) (granting temporary restraining order, ordering immediately release from custody, and barring Respondents from re-detaining petitioner without a pre-deprivation hearing); *Hernandez Nieves v. Kaiser*, No. 25-cv-06921-LB, Dkt. 10 (N.D. Cal. Aug. 17, 2025) (same).[1]

---

[1] In addition to being constrained by due process, ICE's authority to re-detain noncitizens is also constrained by BIA case law. Although the statute and regulations grant ICE the ability to revoke a noncitizen's immigration bond, 8 U.S.C. § 1226(b); 8 C.F.R. § 236.1(c)(9), the BIA recognized that ICE's authority to re-arrest noncitizens is implicitly limited to situations where there is a material "change in circumstances." *Matter of Sugay*, 17 I&N Dec. 637, 640 (BIA 1981). The Ninth Circuit has assumed that, under *Sugay*, ICE has no authority to re-detain absent changed circumstances. *Panosyan v. Mayorkas*, 854 F. Appx. 787, 788 (9th Cir. 2021). Thus, ICE may only re-

MOTION FOR TRO; POINTS AND AUTHORITIES I.S.O. PETITIONER'S MOTION FOR TRO/PI
No. 5:25-cv-8774-VC

Courts have analyzed these claims by considering whether there exists a protected liberty interest under the Due Process Clause, and then examining the procedures necessary to ensure any deprivation of that protected liberty interest accords with the Constitution. *See Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989); *see also Duong*, 2025 U.S. Dist. LEXIS 185024, at *9. That analysis leads to the same result here.

      1.   Mr. ▇▇▇▇ Has a Protected Liberty Interest in His Release

Mr. ▇▇▇▇ liberty from immigration custody is protected by the Due Process Clause: "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. Further, the Supreme Court has repeatedly recognized that individuals' weighty interest in avoiding re-incarceration is protected by the Due Process Clause. *Morrissey v. Brewer*, 408 U.S. 471, 482-483 (1972) (holding that a parolee has a protected liberty interest in his conditional release); *Young v. Harper*, 520 U.S. 143, 146-47 (1997); *Gagnon v. Scarpelli*, 411 U.S. 778, 781-82 (1973).

In *Morrissey*, the Supreme Court examined the "nature of the interest" that a parolee has in "his continued liberty." 408 U.S. at 481-82. The Court noted that, "subject to the conditions of his parole, [a parolee] can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life." *Id.* at 482. The Court explained that "the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a grievous loss on the parolee and often others." *Id.* Therefore, "[b]y whatever name, the liberty is valuable and must be seen within the protection of the [Fifth] Amendment." *Morrissey*, 408 U.S. at 482.

This basic principle—that individuals have a liberty interest in their conditional release—has been reinforced by both the Supreme Court and the circuit courts on numerous occasions. *See, e.g.*, *Young*, 520 U.S. at 152 (holding that individuals placed in a pre-parole

---

detain a noncitizen like Mr. ▇▇▇▇ if changed circumstances *increases* his risk of flight or danger to the community. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017) (discussing *Sugay*). Because Mr. ▇▇▇▇ has repeatedly appeared at ICE or ISAP offices and has never been arrested or convicted of any crime during his five years at liberty, his risk of flight and danger have significantly *decreased* since this Court ordered his release in May 2020. His re-detention thus violates BIA case law in addition to Due Process.

program created to reduce prison overcrowding have a protected liberty interest requiring pre-deprivation process); *Gagnon*, 411 U.S. at 781-82 (holding that individuals released on felony probation have a protected liberty interest requiring pre-deprivation process). In fact, an individual maintains a protected liberty interest in his freedom even when he obtained liberty through a mistake of law or fact. *See Hurd v. District of Columbia*, 864 F.3d 671, 683 (D.C. Cir. 2017); *Johnson v. Williford*, 682 F.2d 868, 873 (9th Cir. 1982) (noting that due process considerations support the notion that an inmate released on parole by mistake, because he was serving a sentence that did not carry a possibility of parole, could not be re-incarcerated because the mistaken release was not his fault, and he had appropriately adjusted to society, so it "would be inconsistent with fundamental principles of liberty and justice" to return him to prison) (internal quotation marks and citation omitted).

Here, when this Court "'compar[es] the specific conditional release in [Mr. █████ case], with the liberty interest in parole as characterized by *Morrissey*,'" it is clear that they are strikingly similar. *See Gonzalez-Fuentes*, 607 F.3d at 887. Just as in *Morrissey*, Mr. █████ release "enables him to do a wide range of things open to persons'" who have never been in custody or convicted of any crime, including to live at home, work, care for his children, and "be with family and friends and to form the other enduring attachments of normal life." *Morrissey*, 408 U.S. at 482. Indeed, because of his wife's disability and limited mobility, Mr. █████ is the primary breadwinner for his family and caretaker for his minor children. Newman Decl., Exh. B (█████ Decl.). He works, pays rent and the bills, takes his children to medical appointments, and serves as emotional support to them. *Id.* He also regularly attends church and contributes to the community. *Id.* He has complied with all conditions of release for over five years, as he litigates his removal proceedings. He has thrice won relief from an IJ, only to have DHS appeal and continue to prolong his immigration proceedings. Dkt. 2-1, Exh. A (Weiss Decl.), ¶ 17-22. And rather than expediting the appeal in Mr. █████ case during the past five years, the government "chose to allow [it] to continue for five years while he reintegrated into the community." *Duong*, 2025 U.S. Dist. LEXIS 185024, at *14-15 (quoting *Carballo v. Andrews*, No. 1:25-cv-00978-KES-EPG (HC), 2025 U.S. Dist. LEXIS 158839 (E.D. Cal. Aug.

15, 2025)). Thus, Mr. ███ has a weighty liberty interest for which process was due before the government could deprive him of it.

2.   Mr. ███ Liberty Interest Mandated a Hearing Before any Re-Arrest

If a petitioner identifies a protected liberty interest, the Court must then determine what process is due. "Adequate, or due, process depends upon the nature of the interest affected. The more important the interest and the greater the effect of its impairment, the greater the procedural safeguards the [government] must provide to satisfy due process." *Haygood v. Younger*, 769 F.2d 1350, 1355-56 (9th Cir. 1985) (en banc) (citing *Morrissey*, 408 U.S. at 481-82). To determine the process due in this context, courts use the flexible balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). *See, e.g.*, *Ortega*, 415 F. Supp. 3d at 970; *Jorge M. F.*, 534 F. Supp. 3d at 1055.

Under the *Mathews* test, the Court balances three factors: "first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and finally the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Haygood*, 769 F.2d at 1357 (citing *Mathews*, 424 U.S. at 335).

Importantly, the Supreme Court "usually has held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis in original). Post-deprivation process only comports with due process in a "special case" where post-deprivation remedies are "the only remedies the State could be expected to provide." *Id.* at 128. Further, only where "one of the variables in the *Mathews* equation—the value of pre-deprivation safeguards—is negligible in preventing the kind of deprivation at issue" can the government avoid providing pre-deprivation process. *Id.*; *see also Lynch v. Baxley*, 744 F.2d 1452 (11th Cir. 1984) (holding that individuals awaiting involuntary civil commitment proceedings may not constitutionally be held in jail pending the determination as to whether they can ultimately be recommitted).

Here, the *Mathews* factors all favor Mr. ▓▓▓ and establish that the government was required to provide him notice and a hearing *prior* to any re-incarceration. *See, e.g.*, *Duong*, 2025 U.S. Dist. LEXIS 185024; *Ortega*, 415 F. Supp. 3d at 970; *Jorge M. F.*, 534 F. Supp. 3d at 1055.

                               *a.*  Mr. ▓▓▓ *private interest in his liberty is profound*

First, Mr. ▓▓▓ private interest in his liberty is substantial. *See Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause."). Under *Morrissey* and its progeny, individuals conditionally released from serving a criminal sentence have a liberty interest that is "valuable," even if that freedom is lawfully recovable. *Morrissey*, 408 U.S. at 482; *Young*, 520 U.S. at 152. Thus, released individuals must be provided notice and a hearing *before* they are incarcerated. *See Johnson*, 682 F.2d at 873; *Gonzalez-Fuentes*, 607 F.3d at 891-92; *Hurd*, 864 F.3d at 683. If that is true for parolees or probations—who have a diminished liberty interest given their convictions—the interest for an individual awaiting civil immigration proceedings is even greater. *See, e.g., Ortega*, 415 F. Supp. 3d at 969 ("[G]iven the civil context" of immigration detention, a noncitizen's interest in release on bond is "arguably greater than the interest of parolees in *Morrissey*.").

Mr. ▓▓▓ private interest is increased by the harm to him and his family from his detention. As explained above, Mr. ▓▓▓ detention leaves his family without the primary breadwinner for his family and caretaker for his minor children. Given his wife's disability and inability to read and write, and his son's depressive mood, this risks physical and mental health impacts for the entire family. Newman Decl., Ex. B (▓▓▓ Decl.). Mr. ▓▓▓ interest in his years-long liberty must be weighed heavily. *See Mathews*, 424 U.S. at 334-35.

                            *b.*  *The Risk of an Erroneous Deprivation of Liberty is High, and a Constitutionally Compliant Hearing Would Decrease That Risk*

The risk of erroneous deprivation of liberty is high if ICE can unilaterally re-detain Mr. ▓▓▓ without a hearing before a neutral adjudicator that determines whether detention serves a

permissible purpose of preventing flight risk or danger. *See Zadvydas*, 533 U.S. at 690. Indeed, this Court already reviewed Mr. ██████ case five years ago, taking flight risk and danger into account, and found that Mr. ████ should be released. Dkt. 2-1, Exh. B. In the time since, the Court has been proven correct: Mr. ████ complied with the bail conditions, reported as required to ICE, and remained law-abiding. Moreover, ICE itself de-escalated Mr. ████ case, taking him off an ankle monitor. Exh. A (Weiss Decl.), ¶ 33. In fact, Mr. ████ was re-detained *when he appeared in person at ISAP*. These developments show that detention is likely *not* warranted.

To the extent ICE is alleging that Mr. ████ violated the terms of his release by uploading photos of himself to the BI Application on the same date he was supposed to but slightly after the brief 2-hour window required, that would not show he is a flight risk. On the contrary, ICE acknowledges he is regularly informing ISAP of his whereabouts, and attending in-person appointments when required. Further, Mr. ████ believes he has not missed any reporting window, and was never informed of a deficiency by ICE or ISAP prior to his detention, nor given an opportunity to provide evidence of compliance or attempted compliance. Dkt. 2-1, Exh. A (Weiss Decl.), ¶ 42.[2] To the extent there is a dispute regarding Mr. ████ compliance with ISAP, a hearing is particularly important in ensuring Mr. ████ is not unnecessarily detained. Yet DHS's choice to re-detain Mr. ████ without notice or a hearing has deprived him of his liberty and separated him from his family and community without any opportunity for Mr. ████ to contest this unilateral action. *See, e.g., Alvarenga Matute v. Wofford*, No. 1:25-cv-01206-KES-SKO, 2025 WL 2817795 (E.D. Cal. Oct. 3, 2025) (granting TRO for petitioner detained at his scheduled check-in without notice or hearing, and where compliance with release terms is in dispute, and ordering immediate release and enjoining Respondents from re-detention without a pre-deprivation hearing before a neutral adjudicator

---

[2] Notably, there have been numerous reports that the BI SmartLINK application is vulnerable to "glitches" and "frequently malfunctions, causing immigrants to miss required check-ins." Newman Decl., Exh. C, Johana Bhuiyan, "Poor tech, opaque rules, exhausted staff: inside the private company surveilling US immigrants," *The Guardian* (Mar 7, 2022); *see also id.*, Exh. D, Giulia McDonnell Nieto del Rio, "Meet SmartLINK, the App Tracking Nearly a Quarter Million Immigrants," *The Markup* (June 27, 2022) (noting "technical problems with the app" including failure to register a photo when sent).

MOTION FOR TRO; POINTS AND AUTHORITIES I.S.O. PETITIONER'S MOTION FOR TRO/PI
No. 5:25-cv-8774-VC

where Respondents bear the burden to show by clear and convincing evidence that petitioner is a flight risk or danger to the community); *J.O.L.R. v. Wofford*, No. 1:25-cv-01241-KES-SKO, 2025 U.S. Dist. LEXIS 187248 (E.D. Cal. Sept. 23, 2025) (same).

The value of a pre-deprivation hearing before a neutral decision-maker is high. "A neutral judge is one of the most basic due process protections." *Castro-Cortez v. INS*, 239 F.3d 1037, 1049 (9th Cir. 2001), *abrogated on other grounds by Fernandez-Vargas v. Gonzales*, 548 U.S. 30 (2006). Indeed, the Ninth Circuit has noted that the risk of an erroneous deprivation of liberty under *Mathews* can be decreased where a neutral decisionmaker, rather than ICE alone, makes custody determinations. *Diouf v. Napolitano* ("*Diouf II*"), 634 F.3d 1081, 1091-92 (9th Cir. 2011). A hearing before a neutral decisionmaker is much more likely than ICE's unilateral decision to produce accurate determinations regarding factual disputes, and to determine whether Mr. ███ actually currently poses a flight risk or danger such that detention is justified. *See, e.g, Doe*, 2025 U.S. Dist. LEXIS 37929, at *15 ("At a hearing, a neutral decisionmaker can consider all of the facts and evidence before him to determine whether Petitioner in fact presents a risk of flight or dangerousness."). Requiring such a hearing be held *before* Mr. ███ is re-detained serves to protect his liberty interest, facilitate his right to counsel and to gather evidence, and ensure that ICE's decision to revoke Mr. ███ release does not evade review. *See Zinermon*, 494 U.S. at 127; *Hurd*, 864 F.3d at 683.

### c. The Government's Interest in Re-Incarcerating Mr. Without a Hearing is Low

Third, the government's interest in detaining Mr. ███ *without* a hearing is low. Mr. ███ has lived in the community caring for his family without incident, and has appeared at virtual and in-person check-ins as requested for more than five years. The government cannot plausibly assert it has any urgent basis for keeping Mr. ███ in detention while a pre-deprivation hearing is scheduled, given his lawful conduct over the last five years. In any event, providing Mr. ███ with a hearing before this Court (or another neutral decisionmaker) to determine whether there is evidence that Mr. ███ *currently* poses any risk of flight or danger

to the community imposes a *de minimis*, if any, burden on the government. Such a hearing is far *less* costly and burdensome for the government than keeping Mr. ███ detained at what the Ninth Circuit described as a "staggering" cost to the public of $158 each day per detainee in 2017, "amounting to a total daily cost of $6.5 million" (the current cost now is likely significantly higher). *Hernandez*, 872 F.3d at 996.

In short, the three *Mathews* factors all weigh in Mr. ███ favor and demonstrate that due process required notice and a hearing before a neutral adjudicator *prior to* Mr. ███ re-incarceration to determine if such re-incarceration is justified. Because Respondents failed to give Mr. ███ the notice and hearing he was due, Due Process requires his immediate release and an order preventing the government from re-incarcerating him unless and until his is provided with a constitutionally compliant hearing. *See, e.g., Duong*, 2025 U.S. Dist. LEXIS 185024; *Qazi*, 2025 U.S. Dist. LEXIS 191922; *J.O.L.R.*, 2025 U.S. Dist. LEXIS 187248, at *15 ("Petitioner's immediate release is required to return him to the status quo ante—the last uncontested status which preceded the pending controversy") (citing cases).

3. <u>Due Process Requires that DHS Bear the Burden to Establish Flight Risk or Danger to the Community By Clear and Convincing Evidence</u>

At a pre-deprivation hearing, due process requires that the government justify re-detention of Mr. ███ by clear and convincing evidence that he poses a flight risk or danger. *See Singh*, 638 F.3d at 1204 ("[D]ue process places a heightened burden of proof on the State in civil proceedings in which the individual interests at stake . . . are both particularly important and more substantial than mere loss of money.") (internal quotation marks omitted); *Ixchop Perez v. McAleenan*, 435 F. Supp. 3d 1055, 1062 (N.D. Cal. 2020) (noting the "consensus view" among District Courts concluding that, "where . . . the government seeks to detain [a noncitizen] pending removal proceedings, it bears the burden of proving that such detention is justified); *Jorge M.F.*, 534 F. Supp. 3d at 1057 (where noncitizen was due a pre-deprivation hearing before being returned to custody, ordering that the government bear the burden at the hearing by clear and convincing evidence); *Doe*, 2025 U.S. Dist. LEXIS 37929, at *21 (same). The hearing must also consider whether alternatives to detention—such as the ISAP program

that has successfully managed Mr. ███ release for more than five years—would adequately ensure Mr. ███ appearance. *See, e.g., G.C. v. Wofford*, No. 1:24-cv-01032-EPG-HC, 2025 U.S. Dist. LEXIS 39773, at *26 (E.D. Cal. Mar. 4, 2025) (ordering bond hearing at which IJ considers alternative conditions of release); *M.R. v. Warden, Mesa Verde Det. Ctr.*, No. 1:24-cv-00988-EPG-HC, 2025 U.S. Dist. LEXIS 75622, at *34 (E.D. Cal. Apr. 21, 2025) (same).

\*       \*       \*

As the above-cited authorities show, Mr. ███ is likely to succeed on his claim that the Due Process Clause require notice and a hearing before a neutral decisionmaker *prior to any* re-incarceration by ICE. At the very minimum, he clearly raises serious questions regarding this issue, so has met the standard for a TRO. *See Alliance for the Wild Rockies*, 632 F.3d at 1135.

**B.  Mr. ███ will Suffer Irreparable Harm Absent Injunctive Relief**

Absent the temporary restraining order he seeks, Mr. ███ will suffer continued irreparable harm while he remains deprived of his liberty and subjected to unlawful incarceration by ICE. Detainees in ICE custody are held in "prison-like conditions." *Preap v. Johnson*, 831 F.3d 1193, 1195 (9th Cir. 2016).  As the Supreme Court has explained, "[t]he time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness." *Barker v. Wingo*, 407 U.S. 514, 532-33 (1972); *accord Nat'l Ctr. for Immigrants Rights, Inc. v. I.N.S.*, 743 F.2d 1365, 1369 (9th Cir. 1984). Moreover, the Ninth Circuit has recognized in "concrete terms the irreparable harms imposed on anyone subject to immigration detention" including "subpar medical and psychiatric care in ICE detention facilities, the economic burdens imposed on detainees and their families as a result of detention, and the collateral harms to children of detainees whose parents are detained." *Hernandez*, 872 F.3d at 995. Finally, the government itself has documented alarmingly poor conditions in ICE detention centers. *See, e.g.*, DHS, Office of Inspector General (OIG), Summary of Unannounced Inspections of ICE Facilities Conducted in Fiscal Years 2020-2023 (2024) (reporting violations of environmental health and safety standards; staffing shortages affecting the level of care detainees received for suicide watch, and detainees being held in administrative segregation in unauthorized restraints, without being

allowed time outside their cell, and with no documentation that they were provided health care or three meals a day).[3]

Additionally, every day that Mr. ▮▮▮ is detained leaves his family without a breadwinner as he is unable to provide for them, including caring for his wife's physical ailments, his son's mental health, and their overall wellbeing. Mr. ▮▮▮ wife cannot read or write, and suffers from chronic pain, so is unable to take care of basic bills and other household tasks. *See* Newman Decl., Ex. B (▮▮▮ Decl.), ¶ 2-3. Mr. ▮▮▮ detention puts the family at significant risk that they will be unable to pay rent or other bills, or care for ordinary household tasks. *Id.* It also risks harming his children's mental health, including his older son who already has a "depressed mood." *Id.*, ¶ 6.

Finally, as the Ninth Circuit has repeatedly found, "the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Because Mr. ▮▮▮ was re-detained without notice and in violation of his constitutional rights, he has established irreparable harm.

### C.  The Balance of Equities and the Public Interest Favor Granting the Temporary Restraining Order

The balance of equities and the public interest undoubtedly favor granting this temporary restraining order. First, the balance of hardships strongly favors Mr. ▮▮▮ The government cannot suffer harm from an injunction that prevents it from engaging in an unlawful practice. *See Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983) ("[T]he INS cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations."). Therefore, the government cannot allege harm arising from a temporary restraining order or preliminary injunction ordering it to comply with the Constitution.

Further, any burden imposed by requiring the DHS to refrain from arresting Mr. ▮▮▮ unless and until he is provided a hearing before a neutral is both *de minimis* and clearly

---

[3] Available at https://www.dhs.gov/sites/default/files/assets/2024-09/OIG-24-59-Sep24.pdf (last accessed Feb. 6, 2024).

outweighed by the substantial harm he will suffer as if he is detained. *See Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) ("Society's interest lies on the side of affording fair procedures to all persons, even though the expenditure of governmental funds is required.").

Finally, a temporary restraining order is in the public interest. First and most importantly, "it would not be equitable or in the public's interest to allow [a party] . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)). If a temporary restraining order is not entered, the government would effectively be granted permission to detain Mr. ████ in violation of the requirements of Due Process. "The public interest and the balance of the equities favor 'prevent[ing] the violation of a party's constitutional rights.'" *Ariz. Dream Act Coal.*, 757 F.3d at 1069 (quoting *Melendres*, 695 F.3d at 1002); *see also Hernandez*, 872 F.3d at 996 ("The public interest benefits from an injunction that ensures that individuals are not deprived of their liberty and held in immigration detention because of bonds established by a likely unconstitutional process."); *cf. Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution.").

## V.   <u>CONCLUSION</u>

For all the above reasons, this Court should find that Mr. ████ warrants a temporary restraining order and a preliminary injunction ordering that Respondents immediately release Mr. ████ and enjoining Respondents from re-arresting him unless and until he is afforded a hearing before a neutral adjudicator to determine whether the government has provided clear and convincing evidence that he is a danger to the community or a flight risk such that re-incarceration is justified.

Dated: October 15, 2025             Respectfully submitted,

/s/ Etan Newman
Etan Newman
*Pro Bono* Attorney for Mr. ████