PETER WEISS, ESQ. (CA SBN 324117)
ETAN NEWMAN, ESQ. (CA SBN 308728)
PANGEA LEGAL SERVICES
391 SUTTER ST., SUITE 500
SAN FRANCISCO, CA 94108
TEL. (415) 547-9382
FAX. (415) 593-5335
etan@pangealegal.org
pete@pangealegal.org

*Pro Bono Attorneys for Petitioner*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ███████████████████████████<br>a.k.a. ███████████████████████,<br><br>                    *Petitioner,*<br><br>v.<br><br>SERGIO ALBARRAN, Field Office Director of the San Francisco Field Office of U.S. Immigration and Customs Enforcement; TODD M. LYONS, Acting Director of U.S. Immigration and Customs Enforcement; KRISTI NOEM, Secretary of the U.S. Department of Homeland Security; and PAMELA BONDI, Attorney General of the United States,<br><br>                    *Respondents.* | Case No. 3:25-cv-8774-VC<br><br>**REPLY TO RESPONDENTS' RESPONSE TO ORDER TO SHOW CAUSE** |

I. **INTRODUCTION**

Petitioner ▓▓▓▓ ("Mr. ▓▓▓ has been living in the community—working, going to church, and caring for his wife and minor children—for more than five years. He has never been arrested for or convicted of any crime. Yet Respondents re-detained him without notice. They confusingly claim they did so because of contested and unexplained *de minimis* ISAP violations, while also claiming that his detention is "mandatory" (in which case the supposed violations would be irrelevant). But there is one thing Respondents do *not* claim: that Mr. ▓▓▓ currently poses any risk of flight or danger to the community that would justify his continuing civil detention.

As this Court has already found, Mr. ▓▓▓ is likely to show that his re-detention is unconstitutional. After voluntarily agreeing to the *Zepeda Rivas* settlement and allowing Mr. ▓▓▓ to remain at liberty through the settlement period and beyond, Respondents cannot arbitrarily re-incarcerate him without process. And after repeatedly telling Mr. ▓▓▓ and this Court that he is subject to detention under 8 U.S.C. § 1226(a)—under which he must be released if he is not a flight risk or danger—Respondents' new claims of mandatory detention are legally untenable. Nothing in Respondents' arguments or new evidence undermines this Court's determination that Mr. ▓▓▓ is entitled to pre-deprivation process to ensure any detention would be constitutionally permissible. The Court should convert its TRO into a preliminary injunction.

II. **RESPONSE TO RESPONDENTS' FACTUAL ALLEGATIONS**

Respondents' factual background is misleading, contrary to findings by officials in their agency, and omits significant relevant facts. Mr. ▓▓▓ briefly responds:

First, Respondents' allegations that Mr. ▓▓▓ is "a gang member with M-18" is contradicted by the findings of their own immigration judge ("IJ").[1] Dkt. 14, at 1. In 2018, after a full hearing at which Mr. ▓▓▓ testified and was subject to cross-examination, the IJ found

---

[1] Immigration Judges are employees of the Department of Justice under the supervision of Respondent Bondi, the Attorney General. *See* 8 C.F.R. § 1003.10(a).

1  Mr. ▆▆▆ credible in his denial of those allegations. Dkt. 6-6 (IJ Dec., 11/5/19), at 3. Noting
2  the "deficiency of [the Salvadoran] evidence" and extensive corruption in El Salvador, the IJ
3  found no probable cause to believe that Mr. ▆▆▆ was involved in any criminal activity in El
4  Salvador. Dkt. 6-7 (IJ Dec., 3/25/19), at 4. Instead, the IJ found that Mr. ▆▆▆ was repeatedly
5  beaten, tortured, and harassed by police in El Salvador because of his political involvement.
6  Dkt. 6-6, at 3. Respondents' misleadingly list Mr. ▆▆▆ arrests in El Salvador, while
7  omitting that each time he was arrested he was either acquitted after trial, charges were
8  dismissed, or charges were never filed. Dkt. 6-7, at 4; Dkt. 2-1, ¶ 8. According to the
9  Department of Homeland Security ("DHS")'s own records, Mr. ▆▆▆ has no tattoos or other
10 indication of gang membership. Dkt. 14-5, at 3. He has never been arrested for or convicted of a
11 crime in the United States while living here for over a decade. Dkt. 2-1, ¶ 43. And Interpol
12 recently deleted the Red Notice that DHS relied upon to allege Mr. ▆▆▆ is a gang member.
13 *Id.*, ¶ 26. Respondents' continued allegations, without acknowledging any of these facts, are
14 baseless and inflammatory.
15
16    Second, while they now claim that Mr. ▆▆▆ is subject to custody "pursuant to INA §
17 235(b)," Dkt. 14, at 1, during the *Zepeda-Rivas* litigation ICE previously informed this Court
18 that Mr. Zepeda was "detained pursuant to § 1226(a)." *Zepeda-Rivas*, No. 20-cv-02731, ECF
19 No. ▆▆ (Deft.'s Resp. to ▆▆ Bail Application). After reviewing the government's
20 arguments—including the allegations regarding gang membership Respondents repeat here—
21 this Court ordered Mr. ▆▆▆ released on bail, with no special conditions. *Id.*; Dkt. 2-1, Exh. B.
22    Third, Mr. ▆▆▆ contests Respondents' vague and shifting allegations of ISAP
23 violations. Dkt. 14, at 3; Exh. A (▆▆▆ Decl.).[2] As explained in his declaration, any "alerts" or

---

[2] Deportation Officer Cruz initially told Mr. ▆▆▆ counsel upon his arrest that he had *two* ISAP violations, Dkt. 1-2, ¶ 41, but in response to this action Cruz now claims Mr. ▆▆▆ had *ten* ISAP "violations." Dkt. 14-1, ¶ 29. These apparently include five "alerts" from 2020 related to a GPS ankle tracker that ISAP subsequently removed, and three instances from 2023, more than two years ago. Dkt. 14-15, at 2. Mr. ▆▆▆ was never previously informed of these alleged violations, and indeed ISAP subsequently de-escalated his case, showing he was not considered out of compliance. *See* Exh. A (▆▆▆ Decl.), ¶ 6-10, 18.

REPLY TO RESP.'S RESPONSE TO OSC
No. 5:25-cv-8774-VC

2

failure to upload photos within the short, two-hour time period was due to problems with the SmartLINK application or other technological issues. Exh. A (███ Decl.), ¶ 12-14; *see also* Dkt. 6-4, 6-5 (noting reports of glitches with ISAP technology). Whenever there was a problem, Mr. ███ uploaded photos within the same day, informed ISAP staff, and was told he remained in compliance. *Id.* His last successful photo check-in was in September 2025, *after* the alleged violations. *Id.*, ¶ 15.

In the five years since Mr. ███ release, he has successfully reported for dozens of in-person, video, and photo check-ins with ISAP, often driving many miles from his house in San Jose to San Francisco for the in-person appointments. *Id.*, ¶ 6-10. In 2021, the government granted Mr. ███ work authorization, and in 2022 it removed his ankle monitor, facts Respondents ignore. Dkt. 2-1, ¶ 20, 35; *see* Dkt. 14. In recent years, Mr. ███ has continued to strenuously comply with ICE and ISAP directives. Indeed, although ICE did not release Mr. ███ on October 15, 2025 until 6:50 pm—nearly an hour after the deadline this Court set in its amended TRO order—he left home at 6:00 a.m. the next morning in an effort to appear in Stockton, as ICE directed. Dkt. 13; Newman Decl., ¶ 15; Exh. A (███ Decl.), ¶ 23-24. Mr. ███ subsequently spent nearly the entire day on October 21, 2025 going to both ICE and ISAP offices, and was placed back on monitoring, including monthly photo check-ins and in-person appointments every three months. Exh. A (███ Decl.), ¶ 25–27. He is committed to continuing to appear as directed, as he has in the past. *Id.*, ¶ 28.

### III. ARGUMENT

The standard for TROs and preliminary injunctions are "substantially identical." *See Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017). This Court granted a TRO requiring Mr. ███ release, and nothing in Respondent's new filing establishes that the TRO should not convert to a preliminary injunction.

        **a. Mr. ▓▓▓ is Likely to Succeed on the Merits**

          **i. The *Zepeda Rivas* Settlement Did Not Eliminate Mr. ▓▓▓ Strong Interest in His 5-Years-Long Liberty**

Respondents' argument that Mr. ▓▓▓ has no protected interest in his liberty pursuant to this Court's *Zepeda Rivas* release order—and that the government can re-arrest him without any process whatsoever—fails on both its reading of the settlement agreement and the law. The majority of courts to consider this issue have rejected Respondents' position. *See Qazi v. Albarran*, No. 2:25-cv-02791-TLN-SCR, 2025 U.S. Dist. LEXIS 191922 (E.D. Cal., Sept. 29, 2025); *Duong v. Kaiser*, No. 25-cv-07598-JST, 2025 U.S. Dist. LEXIS 185024 (N.D. Cal. Sept. 19, 2025); *Carballo v. Andrews*, No. 1:25-cv-00978-KES-EPG (HC), 2025 U.S. Dist. LEXIS 158839 (E.D. Cal. Aug. 15, 2025).

As an initial matter, Respondents overread the settlement agreement. Contrary to their suggestion, the settlement did not waive or limit Mr. ▓▓▓ otherwise applicable rights. *Duong*, 2025 U.S. Dist. LEXIS 185024, at *12. In fact, the government agreed to explicit language providing that the settlement "shall not have any preclusive effect" on a class member's legal challenge to the basis for their custody "now or in the future." *Zepeda Rivas*, No. 20-v-02731-CV, ECF 1205-1, at 21 ("*Zepeda Rivas* Settlement") (Section VII.B). The agreement further provided that, subsequent to its sunset date, re-arrest "will occur pursuant to generally applicable law and policy." *Id.*, at 16 (Section III.G). That law and policy undoubtedly includes the constitutional principles regarding the process required to rearrest those at liberty. *See, e.g., Morrissey v. Brewer*, 408 U.S. 471 (1972). It also includes BIA law and ICE policy precluding the re-arrest of individuals absent a material change in circumstances. *See Matter of Sugay*, 17 I&N Dec. 637, 640 (BIA 1981); *see also Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017). Respondents have not made any serious allegation that there is a material change here.[3]

---

[3] Although Respondents claim Mr. ▓▓▓ was arrested "due to" ISAP violations in which he allegedly uploaded photos to SmartLINK slightly late, Dkt. 14-1, ¶ 30, they do not contend, nor could they, that this is a material change of circumstances showing he is a flight risk. Dkt. 14. Rather, Mr. ▓▓▓ has judiciously attended dozens of check-ins over five years and continues to diligently comply with ICE's shifting directives. *See* ▓▓▓ Decl., ¶ 4-10.

REPLY TO RESP.'S RESPONSE TO OSC
No. 5:25-cv-8774-VC

Further, Respondents are wrong that the settlement agreement gave Mr. ▇ a clear indication that his release would be temporary. Dkt. 14, at 8. Despite "heavily negotiat[ing]" the agreement, *id.* at 6, the government included no terms requiring re-detention of class members—even those subject to "mandatory detention"—upon its sunset date, nor establishing that release would necessarily be temporary. *See generally Zepeda Rivas* Settlement. ICE *did* explicitly reserve the right to re-detain class members during the 3-year-period if they posed a danger or flight risk based on certain criteria. *Id.* at 13 (Section III.A). None of those criteria applied to Mr. ▇ Thus, as this Court rightly noted, by voluntarily agreeing not to detain Mr. ▇ and allowing his freedom, ICE necessarily determined that he is not a danger or flight risk requiring detention. *See* Dkt. 11. If he *did* pose any risk, the government certainly would not have permitted him to remain in the community for so long—including for four months beyond the settlement sunset date. ICE's voluntary agreement to the settlement two years after Mr. ▇ was released gave him the expectation he would remain free absent a material change, per BIA law and ICE policy. ICE's own release paperwork from May 2020 contributed to this expectation: it informed Mr. ▇ that he was being released "provided" that he complied with ICE's conditions, suggesting that his liberty would continue as long as he was in material compliance. Dkt. 14-14, at 2.

In any event, Respondents' arguments regarding Mr. ▇ expectations about the duration of his liberty are a red herring. Under *Morrissey* and its progeny, the crucial question to determine whether there is a liberty interest protected by the Due Process Clause is the *level of freedom* enjoyed during release—not whether, as Respondents' contend, the release is "conditional." Dkt. 14, at 6; *see, e.g., Morrissey*, 408 U.S. at 481 (finding due process right in release even though parole officer had "broad discretion" to revoke parole); *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 887 (1st Cir. 2010).[4] For example, in *Young v. Harper*, the Supreme

---

[4] Contrary to respondents' contention in a footnote, there is no reasonable distinction between this case and the *Morrissey* line. Dkt. 14, at 12 n.3. Mr. ▇ interest in his "integration" into the community is no less than a parolee's, particularly given that he has been thrice granted protection by an IJ that would allow him to remain in the United States. If anything, "given the

REPLY TO RESP.'S RESPONSE TO OSC
No. 5:25-cv-8774-VC

Court considered whether a preparole program "is more similar to parole or minimum security imprisonment" and determined that because the petitioner there "kept his own residence; he sought, obtained, and maintained a job; and he lived a life generally free of the incidents of imprisonment" he had a protected liberty interest in his release. 520 U.S. 143, 146–47 (1997). Indeed, even a person released from custody by mistake has a protected liberty interest because he "like a parolee, was able to be—and was—gainfully employed and free to be with family and friends and to form the other enduring attachments of normal life." *Hurd v. District of Columbia*, 864 F.3d 671, 683 (D.C. Cir. 2017). Here, Respondents do not contest that during the last five years, Mr. ▮▮▮▮ has lived with his family, worked, and attended church, and that his re-detention would cause "grievous loss" for him and his family, including his wife who cannot adequately care for the children alone because of chronic pain. *See Morrisey*, 408 U.S. at 481; Dkt. 2-1, ¶ 5–6; Dkt. 6-3. Mr. ▮▮▮▮ has doubtless enjoyed the same level of freedom as the conditionally released people in *Morrissey*, *Young*, and *Hurd*.

Ignoring the majority of courts that have agreed with this Court's TRO reasoning, Respondents cite the lone decision concluding otherwise. Dkt. 14, at 6 (citing *Giorges v. Kaiser*, No. 25cv7683-NW, 2025 U.S. Dist. LEXIS 201578 (Oct. 10, 2025). Yet the analysis in *Giorges* is wrong and distinguishable on several grounds. First, in assessing petitioners' liberty interest Judge Wise wrongly focused on the "expiration date" of the *Zepeda Rivas* settlement, *id.* at *22, ignoring that after the sunset of the settlement, class members were "left with the rights afforded [them] by the immigration statutes and the Due Process Clause," including the due process right to process prior to re-detention. *Duong*, 2025 U.S. Dist. LEXIS 185024, at *13. Second, she relied heavily on the government's "rights" to detain and deport noncitizens who are "subject to final orders of removal." *Giorges*, 2025 U.S. Dist. LEXIS 201578, at *22. But Mr. ▮▮▮▮ is not subject to a final order; he has never been ordered removed by an IJ and his case remains pending before the agency. Dkt. 2-1, ¶ 28. Third, as this Court already found, *Giorges*' reliance on *Uc Encarnacion* is misplaced since in that case the IJ's release order never became final

---

civil context" of immigration detention, his interest in release is "arguably greater than the interest of parolees in *Morrissey*." *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 969 (N.D. Cal. 2019).

REPLY TO RESP.'S RESPONSE TO OSC
No. 5:25-cv-8774-VC

6

while on appeal before the BIA. *See Uc Encarnacion v.* Kaiser, No. 22-cv-04369-CRB, 2022 U.S. Dist. LEXIS 188274 (N.D. Cal. Oct. 14, 2022); 8 C.F.R. § 1003.39. By contrast, this Court's bail order finding Mr. ▮▮▮ *not* to be a flight risk or danger became final, at the latest, upon the government's settlement and decision not to pursue its appeal of *Zepeda Rivas*.

Finally, Mr. ▮▮▮ substantial interest in his continued liberty is further buttressed by the particular procedural posture of his case and the government's own delays. Despite three orders from an IJ granting him relief, the last of which was prior to this Court's release order, the BIA has now sat on DHS's appeal for nearly six years. Mr. ▮▮▮ immigration case—and any statutory basis for detention—should have been long over by the expiration of the settlement agreement. *See* 8 C.F.R. § 1003.1(e)(8) (providing that the BIA should ordinarily decide appeals within 90 or 180 days). Yet by "cho[osing] to allow [Mr. ▮▮▮'s proceedings to continue for [more than] five years while he reintegrated into the community" the government allowed him to develop a substantial liberty interest. *Duong*, 2025 U.S. Dist. LEXIS 185024. Respondents' fail to establish that Mr. ▮▮▮ can nevertheless be re-detained without process and without any material change showing an increased risk of flight or danger.

### ii. Respondents' Change of Heart Regarding Detention Authority is Wrong and Irrelevant to Mr. ▮▮▮ Due Process Claims

Respondents' argument that Mr. ▮▮▮ is "subject to mandatory detention under § 1225(b)" is belied by their own actions and their previous representations to this Court. *See* Dkt. 6-9 (DHS exercising authority "contained in section 236 of the [INA]" to continue detention); Dkt. 14-8 (same); Dkt. 14-11 (DHS arguments on bond); Dkt. 14-6 (IJ order releasing Mr. ▮▮▮ on bond); Dkt. 14-14 (DHS releasing on recognizance "in accordance with section 236 of the [INA]"); *Zepeda Rivas*, No. 20-cv-02731, ECF No. ▮▮▮ (Def's Response to Bail App.) ("Mr. ▮▮▮ ▮▮▮ is detained pursuant to 8 U.S.C. § 1226(a)"). And though Respondents attempt to elide it, Mr. ▮▮▮ *was* conditionally released under § 1226(a) in 2015. *See* Dkt. 14-6; *see also* Dkt. 14-14. Having chosen to detain and release Mr. ▮▮▮ under § 1226(a), the government "cannot simply switch tracks" to § 1225(b). *Aceros v. Kaiser*, No. 25-cv-06924-EMC, 2025 U.S Dist. LEXIS 179594, *21 (N.D. Cal. Sept. 12, 2025). Further, as an avalanche

REPLY TO RESP.'S RESPONSE TO OSC
No. 5:25-cv-8774-VC

7

of courts in this district and beyond have compellingly explained, Respondents' newfangled statutory interpretation that anyone who entered the United States is an "applicant for admission" subject to "mandatory detention" under § 1225(b) is simply wrong on the law. *Id.* at \*22-33; *see also Vasquez v. Bostok*, 779 F. Supp. 3d 1239 (W.D. Wash. 2025); *Contreras-Cervantes v. Raycraft*, No. 2:25-cv-13073, 2025 U.S. Dist. LEXIS 205416, at \*24 n.4 (E.D. Mich., Oct. 17, 2025) (citing dozens of cases from around the country).

In any event, ICE's statutory detention authority is irrelevant because, "regardless of which detention statute applies," Mr. ▓▓▓ has a strong liberty interest in his freedom. *Mendoza v. Albarran*, No. 25-cv-08205-VC, 2025 U.S. Dist. LEXIS 195992, at \*2 (N.D. Cal. Oct. 10, 2025); *see also Duong*, 2025 U.S. Dist. LEXIS 185024 (granting PI for petitioner subject to mandatory detention under § 1226(c)). Respondents' attempt to minimize Mr. ▓▓▓ entitlement to due process based solely on his manner of entry, despite his ten years living in this country, is unavailing. *See* Dkt. 14, at 11 (citing *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020)). "*Thuraissigiam*'s holding concerns the right to additional due process sought *over admission determinations*. It does not address the due process rights of a noncitizen to remain free once released." *Aceros*, 2025 U.S. Dist. LEXIS 179594, at \*16 (emphasis added). Rather, "the government's discretion to incarcerate noncitizens is always constrained by the requirements of due process." *Hernandez v. Sessions*, 872 F.3d 976, 994–95 (9th Cir. 2017). That binding statement applies here.

### iii. The *Mathews* Test Weighs Heavily in Mr. ▓▓▓ Favor

Respondents acknowledge that the *Mathews* test is "flexible" and can apply to due process challenges to immigration detention. Dkt. 14, at 9. They provide no compelling reason to overturn the Court's proper application of that framework in its TRO order. Dkt. 11.

First, Mr. ▓▓▓ interest in his freedom from bodily restraint is at the "heart of the liberty" inherent in the Due Process Clause. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Mr. ▓▓▓ has been found eligible for protection from removal *three* times, and has spent the last five years at liberty caring for his family. Respondents claim that Mr. ▓▓▓ interest in freedom is reduced because he is "subject to mandatory detention." Dkt. 14, at 6. That is wrong,

REPLY TO RESP.'S RESPONSE TO OSC
No. 5:25-cv-8774-VC

8

1   but even if it were not, Mr. ▊ interest in his personal liberty is strong regardless of the
2   detention statute that applies. *See, e.g., Masood v. Barr*, No. 19-cv-07623-JD, 2025 U.S. Dist.
3   LEXIS 4809 (N.D. Cal. Jan. 8, 2020) (granting habeas for individual detained under § 1225(b)).

4       Second, the risk of erroneous deprivation is extraordinarily high. Indeed, respondents
5   have not even attempted to assert that Mr. ▊ is *currently* a risk of flight or danger to the
6   community, the only permissible justifications for civil immigration detention. *See generally*
7   Dkt. 14; *Zadvydas*, 533 U.S. at 690. Mr. ▊ has never been arrested in ten years in the
8   United States, and has dutifully appeared for immigration appointments—including two at
9   which ICE arrested him upon his arrival. Dkt. 2-1, ¶ 15, 40. This Court already determined Mr.
10  ▊ is *not* a flight risk or danger, and its determination has been confirmed by Mr. ▊
11  conduct for the past five years. Given ICE's shifting explanations for their decision to re-detain
12  Mr. ▊ his repeated grants of relief by an IJ, and the government's yearslong delays in
13  adjudicating DHS's appeal, a *pre-detention* hearing before a neutral adjudicator is particularly
14  important. *See Demore v. Kim*, 538 U.S. 510, 532 (2003) (Kennedy, J., concurring) (even for a
15  noncitizen subject to mandatory detention, "were there to be an unreasonable delay by [the
16  government] in pursuing and completing deportation proceedings, it could become necessary
17  then to inquire whether the detention is not to facilitate deportation, or to protect against risk of
18  flight or dangerousness, but for other reasons"); *Zinermon v. Burch*, 494 U.S. 113, 127 (1990)
19  (a hearing is usually required "before the State deprives a person of liberty or property").

20      Third, Respondents' interest in detaining Mr. ▊ without a pre-deprivation hearing
21  is low. Respondents do not contest that a hearing poses a minimal burden. Dkt. 6, at 21-22.[5] Nor
22  could they reasonably assert an urgent need to incarcerate Mr. ▊ given his law-abiding
23  record. Respondents waited more than six weeks to detain Mr. ▊ even after the ISAP
24  "violations" they now assert. *See* Dkt. 14-1, ¶ 29–30. And since the TRO order, Mr. ▊ has
25  continued to judiciously comply with ICE directives that he appear, even at appointments hours

---

[5] Respondents do not contest that in any pre-deprivation hearing the burden must be on the DHS to show flight risk or danger by clear and convincing evidence. *See* Dkt. 6, at 17-18; *Singh v. Holder*, 638 F.3d 1196, 1204 (9th Cir. 2011). They have therefore waived any contrary argument. *See United States v. McEnry*, 659 F.3d 893, 902 (9th Cir. 2011).

REPLY TO RESP.'S RESPONSE TO OSC
No. 5:25-cv-8774-VC

9

from his home for which he had little notice. Exh. A (▮▮▮ Decl.), ¶ 23-27. The *Mathews* test weighs in Mr. ▮▮▮ favor, and he is likely to succeed on his procedural due process claim. *See* Dkt. 1, ¶ 19-20.[6]

### b. Mr. ▮▮▮ Would Suffer Irreparable Harm if Detained

Respondents ignore the Ninth Circuit's recognition of the "concrete…irreparable harms imposed on anyone subject to immigration detention," *Hernandez*, 872 F.3d at 995, and do not contest Mr. ▮▮▮ allegations of "alarmingly poor conditions in ICE detention centers." Dkt. 6, at 19. Detention would also leave Mr. ▮▮▮ family without a breadwinner and his wife—who suffers from chronic pain and cannot read or write—unable to fully care for his minor children. Dkt. 6-3. Respondents argue that there is no irreparable harm where Mr. ▮▮▮ is not clearly entitled to relief, but that is wrong. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) (applying a sliding scale approach to PI factors). Regardless, Mr. ▮▮▮ has shown that detention would violate his constitutional rights, which "unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

### c. The Balance of Equities and Public Interest Favor Mr. ▮▮▮

Finally, Respondents allege no harm to the government from a preliminary injunction other than that it would contravene the "statutory scheme" of § 1225(b). Dkt. 14, at 14. But Respondents themselves have treated Mr. ▮▮▮ as subject to § 1226(a) for ten years. They fail to explain why declining to adopt a new statutory interpretation overwhelmingly rejected by the courts would cause the public any harm, in general or in this case. Rather, the public interest "lies on the side of affording fair procedures to all persons," including Mr. ▮▮▮ *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983). Here, that requires a hearing before a neutral adjudicator before Mr. ▮▮▮ is arbitrarily and unnecessarily detained.

### IV. CONCLUSION

For all the above reasons, and those stated in Mr. ▮▮▮ TRO Motion, this Court should convert the TRO into a preliminary injunction.

---

[6] Mr. ▮▮▮ is also likely to succeed on the other claims in the habeas petition, including substantive due process and statutory challenges to his re-detention. *See* Dkt. 1, at 20-21.

REPLY TO RESP.'S RESPONSE TO OSC
No. 5:25-cv-8774-VC

10

Dated: October 24, 2025              Respectfully submitted,

                                     /s/ Peter Weiss
                                     Peter Weiss
                                     Etan Newman
                                     *Pro Bono* Attorneys for Mr. ███

REPLY TO RESP.'S RESPONSE TO OSC
No. 5:25-cv-8774-VC

11